Barry I. Levy, Esq. (BL 2190)
Michael A. Sirignano, Esq. (MS 5263)
Ryan Goldberg, Esq. (RG 7570)
Sean Gorton, Esq. (SG 9310)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,
GEICO Indemnity Co., GEICO General Insurance Company
and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

               Plaintiffs,

         -against-

ALEX KHAIT, D.C.,
CITY CHIROPRACTIC, P.C.,
ATLANTIC CHIROPRACTIC, P.C.,
ACTIVE CHIROPRACTIC, P.C.,
ACTUAL CHIROPRACTIC, P.C.,
AMERICAN CHIROPRACTIC CARE, P.C., and
JOHN DOE DEFENDANTS "1" – "10",

               Defendants.

------------------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,100,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including purported examinations, sensory nerve conduction threshold ("s-NCT") tests, "neuromuscular re-education" therapy services, and chiropractic manipulation under anesthesia ("MUA") procedures (collectively the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by GEICO ("Insureds") and other insurers.

2.      Defendant, Alex Khait, D.C. ("Khait"), is a chiropractor licensed to practice chiropractic in New York who purports to own a series of chiropractic professional corporations, including Defendants City Chiropractic, P.C., Atlantic Chiropractic, P.C., Active Chiropractic, P.C., Actual Chiropractic, P.C., and American Chiropractic Care, P.C. (collectively, the "PC Defendants"), that have billed GEICO and other New York automobile insurers for the grossly excessive and medically useless Fraudulent Services.  Khait, along with John Doe Defendants "1" – "10," perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit the PC Defendants to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

3.      GEICO seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,800,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

> (i)      the Fraudulent Services were not medically necessary and were provided –
> to the extent that they were provided at all – pursuant to pre-determined

fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit Insureds;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)     the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback and self-referral arrangements; and

(iv)     in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of City Chiropractic, P.C., Atlantic Chiropractic, P.C., Active Chiropractic, P.C., Actual Chiropractic, P.C., and American Chiropractic Care, P.C., and therefore were unreimbursable.

4.     The Defendants fall into the following categories:

(i)     Defendants City Chiropractic, P.C. ("City Chiropractic"), Atlantic Chiropractic, P.C. ("Atlantic Chiropractic"), Active Chiropractic, P.C. ("Active Chiropractic"), American Chiropractic Care, P.C. ("American Chiropractic"), and Actual Chiropractic, P.C. ("Actual Chiropractic")(collectively the "PC Defendants") are a series of New York chiropractic professional corporations through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(ii)     Defendant Alex Khait, D.C. ("Khait") is a chiropractor licensed to practice chiropractic in New York, who purports to own the PC Defendants, and who purported to perform some of the Fraudulent Services.

(iii)     John Doe Defendants "1" – "10" are individuals who aided and abetted the fraudulent scheme perpetrated against GEICO by, among other things, referring Insureds to the PC Defendants in exchange for kickbacks from Khait and the PC Defendants and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

5.     As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to

3

financially enrich the Defendants, rather than to treat or otherwise benefit Insureds; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback and self-referral arrangements; and (iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Khait or the PC Defendants.

6.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the PC Defendants.

7.     The charts annexed hereto as Exhibits "1" – "5" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

8.     The Defendants' fraudulent scheme continues uninterrupted through the present, as the PC Defendants continue to seek collection on pending charges for the Fraudulent Services.

9.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,100,000.00.

## THE PARTIES

### I.     Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.     Defendants

11.     Defendant Khait resides in and is a citizen of New York. Khait was licensed to practice chiropractic in New York on November 19, 2001 and serves as the nominal or "paper" owner of the PC Defendants.

12.     Defendant City Chiropractic is a New York professional corporation incorporated on or about November 14, 2006, with its principal place of business in New York, and purports to be owned and controlled by Khait.  City Chiropractic has been used by Khait and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

13.     Defendant Atlantic Chiropractic is a New York professional corporation incorporated on or about June 19, 2007, with its principal place of business in New York, and purports to be owned and controlled by Khait.  Atlantic Chiropractic has been used by Khait and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

14.     Defendant Active Chiropractic is a New York professional corporation incorporated on or about May 15, 2008, with its principal place of business in New York, and purports to be owned and controlled by Khait.  Active Chiropractic has been used by Khait and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

15.     Defendant American Chiropractic is a New York professional corporation incorporated on or about July 15, 2009, with its principal place of business in New York, and purports to be owned and controlled by Khait.  American Chiropractic has been used by Khait and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

16.     Defendant Actual Chiropractic is a New York professional corporation incorporated on or about September 21, 2010, with its principal place of business in New York, and purports to be owned and controlled by Khait.  Actual Chiropractic has been used by Khait and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to GEICO and other insurers.

17.     Upon information and belief, John Doe Defendants "1" – "10" reside in and are citizens of New York.   John Doe Defendants "1" – "10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, referring Insureds to the PC Defendants in exchange for kickbacks from Khait and the PC Defendants and spearheading the pre-determined fraudulent protocols used to maximize profits, without regard to genuine patient care.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

21.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

23.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

24.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

25.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").   In the alternative, in New York, a healthcare services provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

26.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

27.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

28.     In New York, only a licensed chiropractor may practice chiropractic, may own and control a professional corporation authorized to practice chiropractic and, absent statutory exceptions not applicable in this case, may derive economic benefit from chiropractic services. Unlicensed individuals in New York may not practice chiropractic, may not own or control a professional corporation authorized to practice chiropractic, may not employ or supervise chiropractors or physicians, and, absent statutory exceptions not applicable in this case, may not derive economic benefit from chiropractic services.

29.     New York law prohibits licensed healthcare services providers, including chiropractors, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

30.     New York law prohibits unlicensed persons not authorized to practice a profession, like chiropractic, from practicing the profession and from sharing in the fees for professional services. See e.g., New York Education Law §6512, §6530 (11), and (19).

31.     New York law further prohibits licensed healthcare services providers, including chiropractors, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

32.     What is more, with limited exceptions that are not applicable here, New York law prohibits licensed healthcare services providers, including chiropractors, from referring patients for electrodiagnostic testing to healthcare practices in which they have an ownership interest, whether or not the healthcare services providers disclose their ownership interest to the patient. See New York Public Health Law § 238-a.

33.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered or allows them to share in the fees for the professional services, or if it engages in illegal self-referrals.

34.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

35.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There is both a statutory and regulatory prohibition against payment of PIP Benefits to

anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

36.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

37.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

38.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

39.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

### A.    Overview of the Scheme

40.    Beginning in 2006, and continuing through the present day, Khait, the PC Defendants, and John Doe Defendants "1"–"10" (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme in which the PC Defendants were used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise unreimbursable services.

41.    The Fraudulent Services billed under the names of the PC Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render healthcare services.

42.    Khait did not operate the PC Defendants at any single, fixed location.

43.    Khait did not market the existence of any of the PC Defendants to the general public.

44.    Khait did not advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of any of the PC Defendants.

45.    Khait did not have his own patients, and did nothing to create a patient base.

46.    Khait did virtually nothing that would be expected of the owner of legitimate chiropractic professional corporations to develop their reputation and attract patients.

47.     Khait, instead, operated the PC Defendants on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx, where the PC Defendants received steady volumes of patients through no efforts of their own, including the following clinics (collectively, the "Clinics"):

- 2639 Atlantic Avenue, Brooklyn
- 855 East 7th Street, Brooklyn
- 37-63 83rd Street, Jackson Heights
- 764 Elmont Road, Elmont
- 348 13th Street, Brooklyn
- 293 Avenue S, Brooklyn
- 535 Utica Avenue, Brooklyn
- 295 Hempstead Turnpike, Elmont
- 4419 3rd Avenue, Bronx
- 1725 York Avenue, New York
- 8 Clinton Place, Bronx
- 205-20 Jamaica Avenue, Queens
- 2386 Jerome Avenue, Bronx
- 5321 Flatlands Avenue, Brooklyn
- 615 Seneca Avenue, Ridgewood
- 1491 Broadway, Brooklyn
- 1575 E 19th Street, Brooklyn
- 1839 Pitkin Avenue, Brooklyn
- 2511 Avenue I, Brooklyn
- 1500 Astor Avenue, Bronx
- 147-16 South Road, Jamaica
- 2261 Church Avenue, Brooklyn
- 277 East 105th Street, New York
- 79-09 Northern Blvd., Jackson Heights

**B.     The Illegal Kickback and Referral Relationships With the Clinics**

48.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

49.     The Clinics provided facilities for the PC Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical

therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

50.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

51.     For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 5321 Flatlands Avenue, Brooklyn, from a "revolving door" of approximately 40 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than ten different chiropractic "names," including Kerisli Chiropractic PC, EA Chiropractic Diagnostics PC, Gallery Chiropractic PC, Orange Chiropractic PC, United Chiropractic PC, Jacobson Chiropractic PC, Pinnacle Chiropractic, Queens Chiropractic Care, Genesis Chiropractic Care PC, Whiplash Chiropractic, and billing from Khait's chiropractic professional corporation, Atlantic Chiropractic.

52.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 764 Elmont Road, Elmont, from a "revolving door" of approximately 60 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than thirteen different chiropractic "names," including Seasoned Chiropractic PC, Albis Chiropractic Care, PC, State Chiropractic, PC, Real Chiropractic Care PC, Professional Chiropractic PC, Dr. Bruce Jacobson DC, PC, Queens Chiropractic Care PC, Avi Weinberger DC, Genesis Chiropractic Care, PC, Whiplash

Chiropractic, JB Chiropractic Services PC, and billing from Khait's chiropractic professional corporations, American Chiropractic, Actual Chiropractic, and Active Chiropractic.

53.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 2261 Church Avenue, Brooklyn, from a "revolving door" of approximately 30 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under approximately ten different chiropractic "names," including New Beginning Chiropractic PC, Wave Diagnostic Medical, PC, Nerve Diagnostic Chiropractic PC, Merrymount Chiropractic, USA Chiropractic Care PC, NY Chiropractic Care PC, Professional Chiropractic Care PC, Lucky Chiropractic Care PC, State Chiropractic, PC, and billing from Khait's chiropractic professional corporation, American Chiropractic.

54.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 1491 Broadway, Brooklyn, from a "revolving door" of approximately 35 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under approximately five different chiropractic "names," including NY Health Care Chiropractic Diagnostic PC, Capolino of NYC Chiropractic, Pro Edge Chiropractic, PC, and billing from Khait's chiropractic professional corporations, City Chiropractic and American Chiropractic.

55.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 205-20 Jamaica Avenue, Queens, from a "revolving door" of approximately 50 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under approximately fifteen different chiropractic "names," including Direct Chiropractic Care PC, Karrelle Benoit DC, Apple

Chiropractic Care PC, Alpine Chiropractic, PC, Desirable Chiropractic, PC, Mind Chiropractic PC, Professional Chiropractic Care PC, Lucky Chiropractic Care PC, Chiropractic Testing Services of NY, PC, NY Chiropractic Rehab PC, Aries Chiropractic PC, Stone Chiropractic, PC, Franklin Square Diagnostics for Chiro PC, Queens Chiropractic Care, PC, Whiplash Chiropractic, and billing from Khait's chiropractic professional corporation, Atlantic Chiropractic.

56.     Similarly, GEICO has received billing for purported healthcare services rendered at a clinic located at 535 Utica Avenue, Brooklyn, from a "revolving door" of more than 35 purportedly different healthcare providers. The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under multiple different chiropractic "names," along with billing from Khait's chiropractic professional corporation, Atlantic. Billing submitted to GEICO also included billing from a number of professional corporations that have been identified by the US Government as being used "solely" in furtherance of an organized No Fault fraud crime ring. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO). These providers include Victory Medical Diagnostic, P.C., Golden Star Medical Diagnostics, P.C., Sky Medical Diagnostics, P.C., Five Boro Psychological Services & Clinical Work, P.C., SM Chiropractic, P.C., Benoit Chiropractic, P.C., and Exultant Medical Diagnostics, P.C.

57.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics.

58.     Khait caused the PC Defendants to operate interchangeably from the Clinics, often having multiple PC Defendants render services from the same clinic.

59.     Khait, in order to obtain access to the Clinics' patient base (i.e., Insureds), entered into illegal financial arrangements with unlicensed persons associated with the Clinics, including

John Doe Defendants 1-10. These illegal financial arrangements included kickbacks to the owners and controllers of the various Clinics, entering into illegal referral arrangements, and/or permitting unlicensed laypersons to impermissibly share in professional fees, which resulted in payments of large sums of monies to the unlicensed laypersons associated with the Clinics.

60.    The kickbacks and monies paid by Khait and the PC Defendants provided to the unlicensed persons associated with the Clinics were disguised as fees to "rent" space or personnel from the Clinics. In fact, these were "pay-to-play" arrangements that caused the owners and controllers of the Clinics to provide access to Insureds and to steer Insureds to the PC Defendants for medically unnecessary services.

61.    In exchange for these kickbacks and illegal financial payments, when an Insured visited one of the Clinics, he or she was referred to one or more of the PC Defendants for the medically unnecessary Fraudulent Services regardless of the individual's symptoms, presentment, or actual need for additional treatment.

62.    The amount paid by the Defendants to the owners and controllers of the various Clinics generally was based on the volume of Insureds that the Clinics would refer to the Defendants for the purported medically unnecessary services.

63.    Khait had no genuine doctor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with the PC Defendants but were simply directed by the Clinics to subject themselves to treatment by whatever chiropractor was working for the PC Defendants that day.

64.    The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the

ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

65.     Khait knew that these arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

66.     In fact, Khait decided to incorporate a series of chiropractic professional corporations, splitting the Defendants' billing for the Fraudulent Services across the various chiropractic professional corporations in order to limit the amount of billing and type of services being submitted by each PC Defendant.

67.     Khait and the Defendants conducted their scheme through multiple chiropractic professional corporations using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

**C.     The Self-Referrals**

68.     To further increase the ill-gotten gains, once Khait and the PC Defendants obtained access to the Clinics' Insureds, in many instances the Insureds were shuttled from one of the PC Defendants to another.

69.     In particular, and as part and parcel of the fraudulent scheme, Khait and Defendants Active Chiropractic, Actual Chiropractic, American Chiropractic, and Atlantic Chiropractic (collectively the "Self-Referral Defendants") routinely engaged in a pattern of illegal self-referrals whereby Khait caused individuals to be referred for Fraudulent Services between the Self-Referral Defendants.  This self-referral scheme was designed to: (i) maximize fraudulent billing opportunities; while (ii) minimizing the amount of fraudulent billing submitted

through any one of the PC Defendants, and thereby conceal and perpetuate their fraudulent scheme.

70.     Pursuant to New York Public Health Law § 238-d, a chiropractor is prohibited from referring patients to healthcare practices in which he or she has an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available."

71.     Furthermore, with limited exceptions that are not applicable here, New Yok Public Health Law § 238-a prohibits a chiropractor from referring patients for electrodiagnostic testing to healthcare practices in which he or she has an ownership interest, whether or not the chiropractor discloses his or her ownership interest to the patient.

72.     In the claims identified in Exhibits "1" – "5", the illegal self-referral scheme typically involved:

    (i)     One of the Self-Referral Defendants obtained a patient pursuant to the illegal kickback arrangements;

    (ii)    One of the Self-Referral Defendants performed an examination and/or in office chiropractic treatments on an Insured;

    (iii)   Khait caused Insureds to be referred from one of the Self-Referral Defendants to another for purported electrodiagnostic testing; and

    (iv)    Neither the Self-Referral Defendants nor any other healthcare provider associated with the Self-Referral Defendants disclosed Khait's ownership interest in the various Self-Referral Defendants, in writing or otherwise.

73.     For example:

    (i)     On or about March 22, 2012, Khait caused an Insured named "FF" to be referred from Actual Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Active Chiropractic for purported electrodiagnostic testing.  Neither Khait, Actual Chiropractic, nor any other individual associated with Khait or Actual Chiropractic disclosed

Khait's ownership interest in Actual Chiropractic and Active Chiropractic to the Insured.

(ii)    On or about April 19, 2012, Khait caused an Insured named "JF" to be referred from Actual Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Active Chiropractic for purported electrodiagnostic testing.   Neither Khait, Actual Chiropractic, nor any other individual associated with Khait or Actual Chiropractic disclosed Khait's ownership interest in Actual Chiropractic and Active Chiropractic to the Insured.

(iii)   On or about May 10, 2012, Khait caused an Insured named "KA" to be referred from Actual Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Active Chiropractic for purported electrodiagnositc testing.   Neither Khait, Actual Chiropractic, nor any other individual associated with Khait or Actual Chiropractic disclosed Khait's ownership interest in Actual Chiropractic and Active Chiropractic to the Insured.

(iv)    On or about October 5, 2011, Khait caused an Insured named "JG" to be referred from Actual Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Active Chiropractic for purported electrodiagnostic testing.   Neither Khait, Actual Chiropractic, nor any other individual associated with Khait or Actual Chiropractic disclosed Khait's ownership interest in Actual Chiropractic and Active Chiropractic to the Insured.

(v)     On or about April 5, 2012, Khait caused an Insured named "CG" to be referred from Actual Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Active Chiropractic for purported electrodiagnostic testing.   Neither Khait, Actual Chiropractic, nor any other individual associated with Khait or Actual Chiropractic disclosed Khait's ownership interest in Actual Chiropractic and Active Chiropractic to the Insured.

(vi)    On or about September 8, 2011 Khait caused an Insured named "AG" to be referred from Actual Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Atlantic Chiropractic for purported electrodiagnostic testing.   Neither Khait, Actual Chiropractic, nor any other individual associated with Khait or Actual Chiropractic disclosed Khait's ownership interest in Actual Chiropractic and Atlantic Chiropractic to the Insured.

(vii)   On or about January 25, 2010, Khait caused an Insured named "JE" to be referred from American Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Atlantic Chiropractic for

19

purported electrodiagnostic testing.  Neither Khait, American Chiropractic nor any other individual associated with Khait disclosed Khait's ownership interest in American Chiropractic and Atlantic Chiropractic to the Insured.

(viii)   On or about February 1, 2010, Khait caused an Insured named "JM" to be referred from American Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Atlantic Chiropractic for purported electrodiagnostic testing.  Neither Khait, American Chiropractic nor any other healthcare services providers associated with Khait disclosed Khait's ownership interest in American Chiropractic and Atlantic Chiropractic to the Insured.

(ix)   On or about February 24, 2011, Khait caused an Insured named "JE" to be referred from Actual Chiropractic, which purported to provide the Insured with in-office chiropractic treatments, to Atlantic Chiropractic for purported electrodiagnostic testing.  Neither Khait, Actual Chiropractic, nor any other individual associated with Khait disclosed Khait's ownership interest in Actual Chiropractic and Atlantic Chiropractic to the Insured.

(x)   On or about October 14, 2011, Khait caused an Insured named "DW" to be referred from Active Chiropractic, which purported to provide the Insured with an initial chiropractic examination, to Atlantic Chiropractic for purported electrodiagnostic testing.  Neither Khait, Active Chiropractic, nor any other individual associated with Khait or Active Chiropractic disclosed Khait's ownership interest in Atlantic Chiropractic and Active Chiropractic to the Insured.

**D.     The Defendants' Fraudulent Treatment and Billing Protocol**

74.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

75.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

20

76.     No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

77.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed, because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1.     The Fraudulent Charges for Initial Chiropractic Examinations

78.     Upon receiving a referral pursuant to the kickbacks that Khait and the PC Defendants paid to the owners, operators, and/or medical professionals that operated from the Clinics, or one of their own illegal self-referrals, the Defendants purported to provide many of the Insureds in the claims identified in Exhibits "1" – "5" with an initial chiropractic examination.

79.     In keeping with the fact that the initial chiropractic examinations were performed pursuant to the kickbacks that Khait and the PC Defendants paid at the Clinics, or pursuant to one of their own illegal self-referrals, the PC Defendants virtually always purported to perform the initial chiropractic examinations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

80.     The initial chiropractic examinations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise unreimbursable "neuromuscular re-education" therapy services, chiropractic manipulation under anesthesia, in-office chiropractic treatments, and s-NCT tests.

81.   Typically, either Khait or someone associated with Khait and the PC Defendants purported to perform the initial chiropractic examinations, which were billed to GEICO through one of the PC Defendants.

82.   The Defendants virtually always billed the initial chiropractic examinations to GEICO under current procedural terminology ("CPT") code 99203, typically resulting in a charge of $54.74.

83.   The charges for the initial chiropractic examinations were fraudulent in that the initial chiropractic examinations were medically unnecessary and were performed pursuant to the kickbacks that Khait and the PC Defendants paid at the Clinics or pursuant to the Defendants' own illegal self-referrals, in coordination with the John Doe Defendants 1-10, not to treat or otherwise benefit the Insureds.

84.   Furthermore, the charges for the initial chiropractic examinations were fraudulent in that they misrepresented the extent of the initial chiropractic examinations.

85.   For example, in every claim identified in Exhibits "1" – "5" for initial chiropractic examinations under CPT code 99203, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor spent with the Insureds or the Insureds' families.

86.   The use of CPT code 99203, which is the CPT examination code a chiropractor can bill under the New York State Workers' Compensation Fee Schedule ("Fee Schedule"), typically requires that a physician spend 30 minutes of face-to-face time with the Insured or the Insured's family.

87.     Though the Defendants billed for their initial chiropractic examinations under CPT code 99203, no chiropractor or other healthcare professional associated with the PC Defendants spent 30 minutes on an initial chiropractic examination.

88.     Rather, the initial chiropractic examinations in the claims identified in Exhibits "1" – "5" rarely lasted more than 10 - 15 minutes.

89.     In keeping with the fact that the initial chiropractic examinations rarely lasted more than 10 – 15 minutes the Defendants used checklist forms in purporting to conduct the initial chiropractic examinations.

90.     The checklist forms that the Defendants used in conducting the initial chiropractic examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

91.     More specifically, the "Testing Treatment and Referrals" section at the end of each initial chiropractic examination form only included a choice of eight pre-printed treatment and referral options.

92.     All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

93.     These interviews and examinations did not require the Defendants to spend more than 10 – 15 minutes of face-to-face time with the Insureds during the putative initial chiropractic examinations.

94.     In addition, pursuant to the Fee Schedule, when the Defendants submitted charges for initial chiropractic examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a chiropractor associated with one of the PC Defendants: (i) took a "detailed" patient history and (ii) conducted a "detailed" physical examination.

### a.   Misrepresentations Regarding "Detailed" Patient Histories

95.     Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), a "detailed" patient history requires – among other things – that the examining physician or chiropractor take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

96.     Pursuant to the Fee Schedule, a "detailed" patient history also requires that the healthcare provider take a past, family, and social history from the patient to the extent that the patient's past, family, and social history is related to the patient's presenting problems.

97.     However, in the claims for initial chiropractic examinations identified in Exhibits "1" – "5", the Defendants, never took a "detailed" patient history from Insureds during the initial chiropractic examinations, inasmuch as they did not take a history of systems related to the patient's presenting problems, did not conduct any review of a limited number of additional systems, and did not take a past, family, and social history from the patient to the extent that the patient's past, family, and social history were related to the patient's presenting problems.

98.     Rather, after purporting to provide the initial chiropractic examinations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

99.     These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

### b.    Misrepresentations Regarding "Detailed" Physical Examinations

100.    Moreover, pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

101.    To the extent that the Insureds in the claims identified in Exhibits "1" – "5" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

102.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to the following:

    (i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

    (ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

    (iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

    (iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

    (v)    brief assessment of mental status;

    (vi)    examination of gait and station;

    (vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

    (viii)    coordination;

    (ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

103.    In the claims for initial chiropractic examinations in Exhibits "1" – "5" in which the Defendants billed for the initial chiropractic examinations under CPT code 99203, the Defendants falsely represented that the Defendants conducted a "detailed" patient examination of the Insureds they purported to treat during the initial chiropractic examinations.

104.    In fact, the Defendants never conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

105.    In keeping with the fact that the Defendants' putative patient examinations were not "detailed", the purported results of the purported examinations were fabricated.

106.    In many of the Defendants' claims for initial chiropractic examinations identified in Exhibits "1" – "5", the data that the Defendants purported to obtain during the putative initial chiropractic examinations were contravened by contemporaneous police reports and hospital records.

107.    For example:

(i)     On May 24, 2009, an Insured named "EW" was involved in an automobile accident.  The police report indicated that no one was injured in the accident.  In keeping with the fact that "EW" was not injured in her minor accident, she did not go to the hospital following the accident.  Even so, following a purported June 8, 2009 initial chiropractic examination at Active Chiropractic, the Defendants falsely diagnosed "EW" with multiple back ailments that purportedly required treatment three times a week for approximately two months.

(ii)    On May 24, 2009, an Insured named "CN" was involved in an automobile accident.  The police report indicated that no one was injured in the accident.  In keeping with the fact that "CN" was not injured in her minor accident, she did not go to the hospital following the accident.  Even so, following a purported June 8, 2009 initial chiropractic examination at Active Chiropractic, the Defendants falsely diagnosed "CN" with multiple

back ailments that purportedly required treatment three times a week for approximately two months.

(iii)    On September 22, 2010, an Insured named "NF" was involved in an automobile accident.  The police report indicated that no one was injured in the accident.  In keeping with the fact that "NF" was not injured in her minor accident, she did not go to the hospital immediately following the accident.  Even so, following a purported October 5, 2010 initial chiropractic examination at Active Chiropractic, the Defendants falsely diagnosed "NF" with multiple back ailments that required follow-up diagnostic testing.

(iv)    On October 20, 2010, an Insured named "NK" was involved in an automobile accident.  The police report indicated that "NK" did not sustain any injuries.  In keeping with the fact that "NK" was not injured in his minor accident, he did not go to the hospital following the accident.  Even so, following a purported October 22, 2010 initial chiropractic examination at Active Chiropractic, the Defendants falsely diagnosed "NK" with multiple back ailments that required follow-up diagnostic testing.

(v)    On July 10, 2010, an Insured named "LB" was involved in an automobile accident.  The police report indicated that "LB" did not sustain any injuries.  In keeping with the fact that "LB" was not injured in his minor accident, she did not go to the hospital following the accident.  Even so, following a purported July 12, 2010 initial chiropractic examination at Active Chiropractic, the Defendants falsely diagnosed "LB" with multiple back ailments that purportedly required treatment three times per week for approximately two months.

(vi)    On April 7, 2011, an Insured named "ED" was involved in an automobile accident.  The police report indicated that "ED" did not sustain any injuries and that his vehicle was drivable following the accident.  In keeping with the fact that "ED" was not injured in his minor accident, he did not go to the hospital following the accident.  Even so, following a purported April 11, 2011 initial chiropractic examination at American Chiropractic, the Defendants falsely diagnosed "ED" with a myriad of back ailments that purportedly required treatment three times per week for approximately one month.

(vii)    On February 9, 2010, an Insured named "JW" was involved in an automobile accident.  The police report indicated that "JW" did not sustain any injuries and that his vehicle was drivable following the accident.  In keeping with the fact that "JW" was not injured in his minor accident, he did not go to the hospital following the accident.  Even so, following a purported April 21, 2010 initial chiropractic examination at American

Chiropractic, the Defendants falsely diagnosed "JW" with multiple back ailments that purportedly required treatment twice a week for approximately two months.

(viii)    On November 28, 2010, an Insured named "JR" was involved in an automobile accident. The police report indicated that "JR" did not sustain any injuries and that his vehicle was drivable following the accident. In keeping with the fact that "JR" was not injured in his minor accident, he did not go to the hospital following the accident. Even so, following a December 3, 2010 initial chiropractic examination at American Chiropractic, the Defendants falsely diagnosed "JR" with multiple back ailments that purportedly required treatment three times per week for approximately two months.

(ix)    On August 14, 2015, an Insured named "RA" was involved in an automobile accident. The police report indicated that "RA" did not sustain any injuries. In keeping with the fact that "RA" was not injured in his minor accident, he did not go to the hospital following the accident. Even so, following a September 10, 2015 initial chiropractic examination at American Chiropractic, the Defendants falsely diagnosed "RA" with multiple back ailments that purportedly required a Current Perception Threshold Study ("CPT") to diagnose or rule out radiculopathy.

(x)    On February 26, 2014, an Insured named "AL" was involved in an automobile accident. The police report indicated that "AL" did not sustain any injuries. That said, AL presented to Kings County Hospital on February 27, 2014 complaining of mild back pain. She was discharged the same day and was instructed to take ibuprofen. Even so, following a purported May 16, 2014 initial chiropractic examination at Actual Chiropractic, "AL" was diagnosed with multiple back ailments purportedly requiring manipulation under anesthesia.

**2.    The Fraudulent Charges for Follow-Up Examinations**

108.    In addition to the fraudulent initial chiropractic examinations, the Defendants purported to subject the Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

109.    The Defendants typically billed the follow-up examinations to GEICO under CPT code 99213 – representing a 15 minute examination and typically resulting in a charge of $33.70.

110.    Like the Defendants' charges for the initial chiropractic examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were

medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that Khait and the PC Defendants paid at the Clinics, or pursuant to the Defendants' own illegal self-referrals, not to treat or otherwise benefit the Insureds.

### 3.     The Fraudulent Charges for Electrodiagnostic Testing

111.    As set forth in Exhibits "1" – "5", based upon the fraudulent, pre-determined "diagnoses" provided during the initial chiropractic examinations, Defendants Atlantic Chiropractic, Active Chiropractic, City Chiropractic, and American Chiropractic (collectively the "s-NCT Defendants") purported to subject many Insureds to a series of medically unnecessary and useless sensory nerve conduction threshold ("s-NCT") tests.

112.    The charges for the s-NCT tests were fraudulent in that the s-NCT tests were medically unnecessary and were performed pursuant to the kickbacks that Khait and the s-NCT Defendants paid at the Clinics or pursuant to the Defendants' own illegal self-referrals, in coordination with John Doe Defendants 1-10, not to treat or otherwise benefit the Insureds.

### a.     The Human Nervous System and Electrodiagnostic Testing

113.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

114.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

115.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

116.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

117.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

118.    s-NCT tests are a form of electrodiagnostic testing, and purportedly were provided by the s-NCT Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

119.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

120.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "6".

121.    The Recommended Policy does not identify s-NCT tests as having any documented usefulness in diagnosis radiculopathies. See Exhibit "6". In fact, s-NCT tests are not recognized as having any value in the diagnosis of any medical condition.

### b.   The Fraudulent s-NCT Tests

122.   Based upon the fraudulent, pre-determined "diagnoses" that the Defendants provided during the initial chiropractic examinations, the s-NCT Defendants purported to subject many Insureds to a series of medically useless s-NCT tests.

123.   The s-NCT Defendants billed the s-NCT tests to GEICO as multiple charges under CPT codes 95999 or 95904, generally resulting in multiple charges of $900.00 for each Insured on whom the s-NCT testing purportedly was performed.

### (i)   Legitimate Tools for Neuropathy Diagnosis

124.   The s-NCT Defendants supposedly provided the s-NCT tests to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

125.   There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and in the nerve roots (i.e., radiculopathies).   These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

126.   Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

127.   If NCV tests and EMG tests are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an auto accident because it typically takes at least that long for nerve damage to appear following a trauma.

128.     MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

### (ii)     The Medically Useless s-NCT Tests

129.     The s-NCT test is a type of non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

130.     The s-NCT tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

131.     In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in s-NCT testing.

132.     If the patient's sensation threshold is greater than the purported normal range of amplitude required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

133.     The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers and the C fibers. The s-NCT tests allegedly can diagnose the

existence, nature, extent and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current. Specifically, the use of electrical currents with frequencies of 5 Hz, 250 Hz and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers and the A-beta fibers, respectively.

134.    Though the s-NCT Defendants purported to subject many Insureds to s-NCT tests, supposedly to diagnose radiculopathies, the s-NCT tests were medically useless because virtually every Insured who purportedly was subjected to the s-NCT tests also received, prior to or about the same time as, NCVs, EMGs, and/or MRIs.

135.    Even if the s-NCT tests purportedly provided by the s-NCT Defendants had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and/or MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the s-NCT tests that the s-NCT Defendants purported to provide.

136.    The supposed primary benefit of the s-NCT tests is that they allegedly can diagnose abnormalities in the sensory nerves less than 14-21 days following an accident, which is sooner than NCV tests and EMG tests can be used to effectively diagnose nerve damage following an accident.

137.    However, the s-NCT Defendants frequently purported to provide s-NCT tests to Insureds either <u>after</u> the Insured received NCV and EMG tests or contemporaneously with the aforementioned tests.

138.    For instance:

    (i)    On May 12, 2011, an Insured named "ED" was purportedly subjected to EMG and NCV tests. Then, on July 19, 2011, Khait purported to provide s-NCT tests to "ED" at Active Chiropractic despite the fact that "ED" had already purportedly received EMG and NCV tests.

(ii)    On April 4, 2014, an Insured named "AL" was purportedly subjected to EMG and NCV tests.  Then, on April 8, 2014, Khait purported to provide s-NCT tests to "AL" at American Chiropractic despite the fact that "AL" had already purportedly received EMG and NCV tests.

(iii)   On February 13, 2012, an Insured named "RG" was purportedly subjected to EMG and NCV tests.  Then, on March 8, 2012, Khait purported to provide s-NCT tests to "RG" at Active Chiropractic despite the fact that "RG" had already purportedly received EMG and NCV tests.

(iv)    On October 25, 2010, an Insured named "SL" was purportedly subjected to EMG and NCV tests.  Then, on October 28, 2010, Khait purported to provide s-NCT tests to "SL" at Atlantic Chiropractic despite the fact that "SL" had already purportedly received EMG and NCV tests.

(v)     On February 1, 2012, an Insured named "GL" was purportedly subjected to EMG and NCV tests.  Then, on February 9, 2012, Khait purported to provide s-NCT tests to "GL" at Active Chiropractic despite the fact that "GL" had already purportedly received EMG and NCV tests.

(vi)    On September 10, 2014, an Insured named "DC" was purportedly subjected to EMG and NCV tests.  Less than two weeks prior, on September 2, 2014, Khait purported to provide s-NCT tests to "DC" at American Chiropractic despite the fact that "DC" was receiving EMG and NCV tests a mere eight days later.

(vii)   On September 30, 2014, an Insured named "AB" was purportedly subjected to EMG and NCV tests.  Less than two weeks prior, on September 22, 2014, Khait purported to provide s-NCT tests to "AB" at American Chiropractic despite the fact that "AB" was receiving EMG and NCV tests a mere eight days later.

(viii)  On November 4, 2014, an Insured named "AB" was purportedly subjected to EMG and NCV tests.  Then, on November 5, 2014, Khait purported to provide s-NCT tests to "AB" at American Chiropractic despite the fact that "AB" had already purportedly received EMG and NCV tests.

(ix)    On April 9, 2013, an Insured named "RD" was purportedly subjected to EMG and NCV tests.  Then, on April 11, 2013, Khait purported to provide s-NCT tests to "RD" at City Chiropractic despite the fact that "RD" had already purportedly received EMG and NCV tests.

(x)     On April 15, 2013, an Insured named "LN" was purportedly subjected to EMG and NCV tests.  Then, on April 16, 2013, Khait purported to provide

s-NCT tests to "LN" at City Chiropractic despite the fact that "LN" had already purportedly received EMG and NCV tests.

139.    Under the circumstances in which they were employed by the s-NCT Defendants, the purported s-NCT tests constituted a purposeful and unnecessary duplication of the NCV tests and EMG tests that the Insureds virtually always purportedly received contemporaneously with the s-NCT tests, and, in many cases, before the s-NCT tests.

140.    Even assuming that there was some diagnostic value for s-NCT tests, the s-NCT tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

141.    In any case, there are no legitimate data to support the use of s-NCT tests to diagnose neuropathies in general or radiculopathies in particular.

142.    There is no reliable evidence of the existence of normal ranges of intensity or amplitude required to evoke a sensation using an s-NCT test device. Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal s-NCT test results are or are not abnormal.

143.    Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a s-NCT test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that sensation threshold less than the normal range would indicate a hyperesthetic condition.

144.    Even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from s-NCT tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

35

145.    Furthermore, even if s-NCT tests could produce any valid diagnostic information regarding the sensory nerve fibers:

    (i)    there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

    (ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

    (iii)    there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

    (iv)    s-NCT tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

    (v)    there would be no legitimate diagnostic advantage to using s-NCT tests to obtain information regarding the sensory nerve fibers where, as here, the s-NCT tests were duplicative of contemporaneously-provided NCV tests, EMG tests, and MRIs.

146.    In keeping with the fact that the s-NCT Defendants' purported s-NCT tests were medically useless, the Centers for Medicare & Medicaid Services ("CMS") have determined that s-NCT tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies and are therefore not compensable. Copies of the pertinent CMS Decision Memo and National Coverage Determination are annexed hereto as Exhibit "7".

147.    In keeping with the fact that the s-NCT Defendants' putative s-NCT tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for s-NCT tests.

148.   In keeping with the fact that the s-NCT Defendants' purported s-NCT tests were medically useless, the putative "results" of the s-NCT Defendants' s-NCT tests were not incorporated into any Insured's treatment plan, and the s-NCT tests played no genuine role in the treatment or care of the Insureds.

(iii)   **Each of the Two Main s-NCT Test Device Manufacturers Claims the Other is a Fraud**

149.   Until 2004, about the same time that CMS was considering the medical benefits of s-NCT testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of s-NCT tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

150.   Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

151.   In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

152.   Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II. True and accurate printouts of PainDx, Inc.'s current website and Neuro Diagnostic Associates, Inc.'s archived website.

153.   To the extent that the Defendants actually provided any s-NCT tests to Insureds in the first instance, they were provided using the Neurometer.

37

154.  Neuro Diagnostic Associates, Inc. claims that the Neurometer does not produce valid data or results, and has been fraudulently marketed.  For its part, Neurotron Inc. has asserted the same claims regarding Neuro Diagnostic Associates, Inc.'s Medi-Dx 7000/Axon-II.

### (iv)  The Defendants' Fraudulent s-NCT Test "Reports"

155.  In support of their fraudulent charges for the s-NCT tests, the s-NCT Defendants submitted phony s-NCT test "reports" which falsely represented that an actual chiropractor had some role in performing and interpreting the tests.

156.  In actuality, to the extent that the s-NCT tests were performed in the first instance, they were performed by unlicensed technicians, and neither Khait, nor any other licensed healthcare provider associated with the s-NCT Defendants, had any role whatsoever in interpreting the test results.

157.  In keeping with the fact that the s-NCT tests were performed by unlicensed technicians, rather than by a licensed chiropractor associated with the s-NCT Defendants, the putative test "reports" did not contain any genuine interpretation of the test data.

158.  Instead, aside from reporting the putative s-NCT data that supposedly were derived from the respective Insured's tests, the phony s-NCT test "reports" each contained a "Summary Report Observations" section that was generated by the s-NCT test device and was included solely to foster the illusion that a licensed healthcare professional had some role in performing or interpreting the tests.

159.  Other than the phony "Summary Report Observations" section of the purported s-NCT test reports, the reports did not contain any interpretation of the data that the s-NCT Defendants purported to obtain from the tests.

160.  The s-NCT Defendants billed for the s-NCT tests as if they were provided by licensed healthcare providers, rather than by the unlicensed technicians, to make it appear as if

the services were eligible for reimbursement. The s-NCT Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

### 4.    The Fraudulent Charges for Chiropractic Manipulation Without Anesthesia

161.    As set forth in Exhibits "1" – "5", based upon the fraudulent, pre-determined "diagnoses" provided during the initial chiropractic examinations, and the phony, pre-determined "results" of the purported electrodiagnostic tests, Defendants Active Chiropractic, Actual Chiropractic, and American Chiropractic (collectively the "Chiropractic Defendants") purported to subject Insureds to many months of medically unnecessary in-office chiropractic treatments.

162.    Like all of the Defendants' other charges for the Fraudulent Services, the charges for the chiropractic manipulations without anesthesia were fraudulent in that the services were medically unnecessary and were performed pursuant to the kickbacks that the Chiropractic Defendants paid at the Clinics or pursuant to the Defendants' own illegal self-referrals, in coordination with John Doe Defendants 1-10, not to treat or otherwise benefit the Insureds.

163.    Virtually none of the Insureds whom the Chiropractic Defendants purported to treat suffered from any significant injuries or continuing health problems as a result of the relatively minor accidents they experienced or purported to experience.

164.    In keeping with the fact that the Insureds in the claims identified in Exhibits "1" - "5" were not seriously injured in their minor automobile accidents, and suffered from no significant injuries or continuing health problems as the result of their accidents, they virtually always either did not visit any hospital at all following their accidents, or else were observed on an outpatient basis for a few hours at a hospital and released with an ordinary sprain or strain diagnosis.

165.    Ordinary strains and sprains virtually always resolve after a brief course of conservative treatment, or no treatment at all.

166.    Even so, and as set forth in Exhibits "1" - "5", the Chiropractic Defendants routinely purported to provide the Insureds with dozens of individual chiropractic treatments, spanning several months, despite the fact that the Insureds did not require them.

167.    In many cases, the Chiropractic Defendants used the bogus electrodiagnostic test "results" they generated as a false basis to justify the continued performance of medically unnecessary chiropractic treatments, long after any of the trivial soft tissue injuries the Insureds sustained in their automobile accidents would have resolved.

**5.    The Fraudulent Neuromuscular Re-Education Treatments**

168.    As part and parcel of the Fraudulent Scheme, in a further attempt to maximize the fraudulent billing the Defendants submitted or caused to be submitted to GEICO, the Chiropractic Defendants purported to provide all Insureds who received in-office chiropractic treatments with "neuromuscular re-education" on each treatment visit.

169.    The Chiropractic Defendants billed the purported "neuromuscular re-education" to GEICO for $22.48 under CPT code 97112.  Because the Chiropractic Defendants typically billed for neuromuscular re-education each date the Insureds also received in-office chiropractic treatments, the Chiropractic Defendants typically billed hundreds of dollars for neuromuscular re-education per Insured.

170.    Neuromuscular re-education is used to re-educate and re-train a body part to perform a function/task that the body part absolutely was ready to do in its pre-injury state. This might include, for example, re-teaching the hand to twist a door knob or grasp a cup.

171.    Broadly speaking, neuromuscular re-education is used following a neurological trauma such as a stroke.

40

172.   Neuromuscular re-education, most assuredly, is not medically necessary to treat muscle strains, sprains, soft tissue injuries, or injuries of a similar nature.

173.   Neuromuscular re-education may be considered medically necessary if at least one of the following conditions is present and documented:

- The Insured has the loss of deep tendon reflexes and vibration sense accompanied by paresthesia, burning, or diffuse pain of the feet, lower legs, and/or fingers; or

- The Insured has nerve palsy, such as peroneal nerve injury causing foot drop; or

- The Insured has muscular weakness of flaccidity as a result of a cerebral dysfunction, a nerve injury or disease, or has had a spinal cord disease or trauma.

174.   Virtually none of the Insureds purportedly treated by the Chiropractic Defendants presented with any of the aforementioned prerequisites, which would justify neuromuscular re-education services.

175.   In the majority of cases, the Chiropractic Defendants purported to render neuromuscular re-education on Insureds each date the Insureds also received chiropractic manipulations without anesthesia.

176.   Given the specific type of injury that neuromuscular re-education is meant to treat, there is no way that this many Insureds needed this treatment as a result of the relatively minor, fender-bender accidents that the Insureds purportedly sustained.

177.   Moreover, the Chiropractic Defendants submitted billing for purported neuromuscular re-education together with billing for standard chiropractic manipulations on each treatment visit, in violation of the Fee Schedule. The Defendants did this repeatedly, despite the daily reimbursement limits applicable to CPT codes 97112 and 98941, when these two codes are billed for procedures and/or modalities performed on the same day.

178.    Pursuant to the Fee Schedule, the Chiropractic Defendants are limited to a maximum reimbursement of 8 "relative value units" where neuromuscular re-education and chiropractic manipulations are performed on the same day, but the Chiropractic Defendants consistently submitted billing seeking more than the 8 relative value units per day, all in an effort to collect fees from GEICO and other New York automobile insurers over and above the maximum permissible charges allowable under the Fee Schedule.

### 6.    The Fraudulent Charges for Chiropractic Manipulation Under Anesthesia

179.    As set forth in Exhibits "1" - "5", based upon the fraudulent, pre-determined "diagnoses" provided during the initial chiropractic examinations, and the phony, pre-determined "results" of the purported electrodiagnostic tests, Defendants Active Chiropractic, Actual Chiropractic, and American Chiropractic (collectively the "MUA Defendants") purported to subject many Insureds to purported chiropractic manipulation under anesthesia ("MUA").

180.    The Defendants submitted billing to GEICO for the purported MUA procedures as multiple charges per Insured under CPT codes 22505, 27275, 23700, and/or 27194.

181.    Like the charges for all of the other Fraudulent Services, the MUA Defendants' charges for the MUAs were fraudulent in that the services were medically unnecessary and were performed pursuant to the kickbacks that Khait and the PC Defendants paid at the Clinics, the Defendants' own illegal self-referrals, and the phony boilerplate "diagnoses" that the Defendants purported to provide following the purported initial chiropractic examinations and electrodiagnostic testing, not to treat or otherwise benefit the Insureds.

182.    MUA involves a series of mobilization, stretching, and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation.

183.   Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in an unsedated patient.

184.   MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as arthrofibrosis of the knee and adhesive capsulitis, as well as to reduce displaced fractures.

185.   MUA is experimental, investigational, and unproven for use on most areas of the body, including the spine, hip, and shoulder. There is a dearth of quality supportive scientific evidence for spinal, hip, or shoulder MUA. There are no randomized controlled trials or published cohort studies on management of specific diagnoses of the spine, hip, or shoulder via MUA.

186.   No evidence exists showing the long-term benefits of MUA.

### a.   The MUA Defendants' Medically Unnecessary Chiropractic Manipulation Under Anesthesia

187.   Virtually every Insured who purportedly received MUA from the MUA Defendants supposedly had their spine, hip, and/or shoulder manipulated.

188.   Given the lack of quality scientific evidence supporting the use of MUA on the spine, hip, or shoulder, the MUA purportedly provided by the MUA Defendants to GEICO Insureds was not medically necessary.

189.   Furthermore, MUA only should be considered in cases where more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, has proved ineffective.

190.   This is because: (i) there is a large body of quality scientific evidence supporting the use of more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, to treat soft tissue injuries to the spine, hip, and shoulder; (ii) there is a lack of

quality scientific evidence supporting the use of MUA on the spine, hip, or shoulder; and (iii) procedures requiring anesthesia – including MUA – involve a level of risk to the patient that are not present in procedures that do not require anesthesia.

191.   Even if MUA was a recognized form of treatment for soft tissue injuries to the spine, hip, or shoulder – and it is not – the MUA purportedly provided by the MUA Defendants was provided without regard to whether more conservative treatment had been effective.

192.   In keeping with the fact that the MUA purportedly provided by the MUA Defendants was provided without regard to whether more conservative treatment had been effective, the Defendants routinely recommended the MUAs within three months after the date of loss.

193.   For instance:

(i)     The MUA Defendants purported to provide MUAs to an Insured named "JA" on April 11, 2012, April 12, 2012, and April 17, 2012.  In keeping with the fact that the Defendants did not wait until "JA" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to perform the MUAs approximately two months after the date of loss.

(ii)    The MUA Defendants purported to provide MUAs to an Insured named "OS" on March 22, 2011, March 24, 2011, and March 25, 2011.  In keeping with the fact that the Defendants did not wait until "OS" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to perform the MUAs less than three months after the date of loss.

(iii)   The MUA Defendants purported to provide MUAs to an Insured named "JS" on May 1, 2012 through May 3, 2012.  In keeping with the fact that the Defendants did not wait until "JS" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to perform the MUAs less than three months after the date of loss.

(iv)    The MUA Defendants purported to provide MUAs to an Insured named "NR" on October 19, 2010, October 21, 2010, and October 22, 2010.  In keeping with the fact that the Defendants did not wait until "NR" had failed a course of more conservative treatment prior to the MUAs, the

Defendants purported to perform the MUAs less than three months after the date of loss.

(v)     The MUA Defendants purported to provide MUAs to an Insured named "JE" on March 18, 2010, March 19, 2010, and March 21, 2010.  In keeping with the fact that the Defendants did not wait until "JE" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to perform the MUAs approximately two months after the date of loss.

(vi)    The MUA Defendants purported to provide MUAs to an Insured named "LN" on April 26, 2013.  In keeping with the fact that that Defendants did not wait until "AN" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to perform the MUAs less than two months after the date of loss.

(vii)   The MUA Defendants purported to provide MUAs to an Insured named "RD" on May 16, 2013, May 17, 2013, and May 19, 2013.  In keeping with the fact that Defendants did not wait until "RD" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to perform the MUAs approximately two months after the date of loss.

(viii)  The MUA Defendants purported to provide a MUA to an Insured named "DC" on October 2, 2014.  In keeping with the fact that Defendants did not wait until "DC" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to perform the MUA less than two months after the date of loss.

(ix)    The MUA Defendants purported to provide MUAs to an Insured named "JC" on December 19, 2014, December 29, 2014, and January 8, 2015.  In keeping with the fact that Defendants did not wait until "JC" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to recommend the MUA less than three months after the date of loss.

(x)     The MUA Defendants purported to provide MUAs to an Insured named "OG" on February 4, 2010, February 5, 2010, and February 7, 2010.  In keeping with the fact that Defendants did not wait until "OG" had failed a course of more conservative treatment prior to the MUAs, the Defendants purported to perform the MUAs approximately two months after the date of loss.

194.     In virtually all of the MUA claims identified in Exhibits "1" - "5", the Insureds had not failed any course of conservative treatment before the Defendants purported to subject them to MUA.

195.     To the contrary, in virtually every case in which the MUA Defendants purported to subject an Insured to MUA, the MUA Defendants' treatment notes, or the treatment notes from other healthcare services providers who treated the Insureds, indicated that the Insureds' conditions were improving through more conservative treatments such as chiropractic manipulation without anesthesia and physical therapy.

   **b.     The Defendants' Fraudulent Billing for Treatment of Non-Existent Pelvic Ring Injuries**

196.     In an attempt to maximize the amount of fraudulent billing that they could submit to GEICO for their medically unnecessary MUA procedures, Defendants Active Chiropractic and American Chiropractic falsely represented that the purported MUA involved a procedure billable under CPT code 27194.

197.     Pursuant to the CPT Assistant, CPT code 27194 is the code used to bill for the treatment of "pelvic ring fracture, dislocation, diastasis or subluxation".

198.     Not a single one of the Insureds in the MUA claims identified in Exhibits "1" – "5" suffered from any pelvic ring fracture, dislocation, diastasis, or subluxation or – indeed – any other injury to their respective pelvic rings.

199.     Even so, and as set forth in Exhibits "1" -"5", when Defendants Active Chiropractic and American Chiropractic billed for their purported MUA using CPT code 27194, they falsely represented that the Insureds suffered from some sort of pelvic ring fracture, dislocation, diastasis, or subluxation.

200.    In keeping with the fact that none of the Insureds who purportedly received MUA in the claims identified in Exhibits "1" - "5" actually suffered from any injury to their pelvic rings, and in keeping with the fact that none of those Insureds actually received any services from Defendants Active Chiropractic and American Chiropractic that were billable under CPT code 27194, none of the MUA treatment notes generated by Defendants Active Chiropractic and American Chiropractic actually reflected any injuries to, or treatment of, the Insureds' pelvic rings.

201.    Defendants Active Chiropractic and American Chiropractic's use of CPT code 27194 to bill for their putative MUA procedures constituted a deliberate misrepresentation of the service that was provided, so as to maximize the amount of fraudulent billing that they could submit for each purported MUA procedure.

**E.    The Fraudulent Billing for Independent Contractor Services**

202.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors.

203.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

204.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a

47

licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). See Exhibit "8".

205.   The Defendants routinely submitted charges to GEICO and other insurers on behalf of the PC Defendants for Fraudulent Services that purportedly were performed by chiropractors and unlicensed technicians other than Khait.

206.   The chiropractors and technicians working under the names of the PC Defendants worked without any supervision by Khait.

207.   The chiropractors and technicians working under the names of the PC Defendants set their own work schedules or had their schedules set for them by the John Does Defendants 1-10.

208.   The chiropractors and technicians working under the names of the PC Defendants did not exclusively provide services for the PC Defendants.

209.   To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers other than Khait were performed by chiropractors and unlicensed technicians whom the Defendants, treated as independent contractors.

210.   For instance, the Defendants:

(i)    paid the chiropractors and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the chiropractors and unlicensed technicians that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the chiropractors and unlicensed technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the chiropractors and unlicensed technicians;

(v)    failed to withhold federal, state or city taxes on behalf of the chiropractors and unlicensed technicians;

(vi)    compelled the chiropractors and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)    permitted the chiropractors and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)    permitted the chiropractors and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the chiropractors and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the chiropractors and unlicensed technicians were independent contractors.

211.    By electing to treat the chiropractors and unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the chiropractors and unlicensed technicians.

212.    Because the chiropractors and unlicensed technicians were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect PIP Benefits in connection with those services.

213.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement.

214.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

215.    In some cases, the Defendants attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Khait on the billing as the treating provider, when in fact he did not provide the underlying treatments.

**F.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

216.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

217.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that

the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than treat or otherwise benefit the Insureds.

(ii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)  The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv)   With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Khait, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the PC Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the PC Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent that they were provided at all.

## III.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

218.   The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

219.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

220.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

221.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal that fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

222.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

223.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the chiropractors and technicians associated with the PC Defendants in order to prevent GEICO from discovering that the chiropractors and technicians performing most of the Fraudulent Services were not employed by the PC Defendants. In many cases, the Defendants actually misrepresented the identity of the individual who purportedly performed the Fraudulent Services, in order to conceal the fact that the services were performed by independent contractors.

224.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

225.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted

through the Defendants were legitimate.  Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

226.  GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

227.  In accordance with the New York no-fault insurance laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for PIP Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for PIP Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

228.  The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

229.  GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,100,000.00 based upon the fraudulent charges.

230.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against Khait and the PC Defendants
### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

231.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

232.    There is an actual case in controversy between GEICO, Khait and the PC Defendants regarding more than $1,800,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO.

233.    Khait and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than treat or otherwise benefit the Insureds.

234.    Khait and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

235.    Khait and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

236.    Khait and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants.

237.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Khait and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants.

### AS AND FOR A SECOND CAUSE OF ACTION
**Against Khait**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

238.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

239.    City Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

240.    Khait knowingly has conducted and/or participated, directly or indirectly, in the conduct of City Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that City Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) City Chiropractic

obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by City Chiropractic's employees.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

241.    City Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Khait operates City Chiropractic, insofar as City Chiropractic is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for City Chiropractic to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by City Chiropractic to the present day.

242.    City Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by City Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

243.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $252,000.00 pursuant to the fraudulent bills submitted through City Chiropractic.

244.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Khait and John Doe Defendants "1-10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

245.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

246.    City Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

247.    Khait and John Doe Defendants "1-10" are employed by or associated with the City Chiropractic enterprise.

248.    Khait and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of City Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that City Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) City Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for

services were provided – to the extent that they were provided at all – by independent contractors, rather than by City Chiropractic's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

249.    Khait and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

250.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $252,000.00 pursuant to the fraudulent bills submitted through City Chiropractic.

251.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Khait and City Chiropractic**
**(Common Law Fraud)**

252.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

253.    Khait and City Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

254.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that City Chiropractic was properly

licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §
5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it
obtained patients through an illegal kickback and self-referral scheme; (ii) in every claim, the
representation that the billed-for services were medically necessary, when in fact the billed-for
services were not medically necessary and were performed and billed pursuant to a pre-
determined, fraudulent protocol designed solely to enrich City Chiropractic and Khait; (iii) in every
claim, the representation that the billed-for services were properly billed in accordance with the
Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and
exaggerated the level and type of services that purportedly were provided in order to inflate the
charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services
were provided by employees of City Chiropractic, when in fact many of the billed-for services
were provided by independent contractors.

255.    Khait and City Chiropractic intentionally made the above-described false and
fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay
charges submitted through City Chiropractic that were not compensable under the New York no-
fault insurance laws.

256.    GEICO has been injured in its business and property by reason of the above-
described conduct in that it has paid at least $252,000.00 pursuant to the fraudulent bills submitted
through City Chiropractic.

257.    Khait and City Chiropractic's extensive fraudulent conduct demonstrates a high
degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

258.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Khait and City Chiropractic
### (Unjust Enrichment)

259.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

260.    As set forth above, Khait and City Chiropractic have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

261.    When GEICO paid the bills and charges submitted by or on behalf of City Chiropractic for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on City Chiropractic and Khait's improper, unlawful, and/or unjust acts.

262.    Khait and City Chiropractic have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Khait and City Chiropractic voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

263.    Khait and City Chiropractic's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

264.    By reason of the above, Khait and City Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $252,000.00

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against John Doe Defendants "1-10"
### (Aiding and Abetting Fraud)

265. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

266. John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Khait and City Chiropractic.

267. The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to City Chiropractic in exchange for illegal kickbacks from Khait and City Chiropractic and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

268. The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Khait or City Chiropractic to obtain payment from GEICO and other insurers.

269. John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Khait and City Chiropractic for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

270. The conduct of John Doe Defendants "1-10" cause GEICO to pay more than $252,000.00 pursuant to the fraudulent bills submitted through City Chiropractic.

271. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

272.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Khait
### (Violation of RICO, 18 U.S.C. § 1962(c))

273.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

274.    Atlantic Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

275.    Khait knowingly has conducted and/or participated, directly or indirectly, in the conduct of Atlantic Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Atlantic Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Atlantic Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Atlantic Chiropractic's employees.   A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise,

in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

276.   Atlantic Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Khait operates Atlantic Chiropractic, insofar as Atlantic Chiropractic is not engaged in legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Atlantic Chiropractic to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Atlantic Chiropractic to the present day.

277.   Atlantic Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Atlantic Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

278.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $392,000.00 pursuant to the fraudulent bills submitted through Atlantic Chiropractic.

279.   By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**Against Khait and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

280.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

281.    Atlantic Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

282.    Khait and John Doe Defendants "1-10" are employed by or associated with the Atlantic Chiropractic enterprise.

283.    Khait and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Atlantic Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Atlantic Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Atlantic Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Atlantic Chiropractic's employees.   A representative sample of the fraudulent bills and corresponding mailing submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the

chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

284.    Khait and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

285.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $392,000.00 pursuant to the fraudulent bills submitted through Atlantic Chiropractic.

286.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
### Against Khait and Atlantic Chiropractic
### (Common Law Fraud)

287.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

288.    Khait and Atlantic Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

289.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Atlantic Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it

obtained patients through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Atlantic Chiropractic and Khait; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Atlantic Chiropractic, when in fact many of the billed-for services were provided by independent contractors.

290.   Khait and Atlantic Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Atlantic Chiropractic that were not compensable under the New York no-fault insurance laws.

291.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $392,000.00 pursuant to the fraudulent bills submitted through Atlantic Chiropractic.

292.   Khait and Atlantic Chiropractic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

293.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Khait and Atlantic Chiropractic

66

**(Unjust Enrichment)**

294.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth herein.

295.   As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

296.   When GEICO paid the bills and charges submitted by or on behalf of Atlantic Chiropractic for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

297.   Atlantic Chiropractic and Khait have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

298.   Atlantic Chiropractic and Khait's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

299.   By reason of the above, Khait and Atlantic Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $392,000.00.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against John Doe Defendants "1-10"
**(Aiding and Abetting Fraud)**

300.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

301.   John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Khait and Atlantic Chiropractic, and knowingly participating

and assisting in subjecting the Insureds to a predetermined treatment protocol to maximize profits without regard to patient care.

302.    The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Atlantic Chiropractic in exchange for illegal kickbacks from Khait and Atlantic Chiropractic.

303.    The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Khait or Atlantic Chiropractic to obtain payment from GEICO and other insurers.

304.    John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Khait and Atlantic Chiropractic for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

305.    The conduct of John Doe Defendants "1-10" cause GEICO to pay more than $392,000.00 pursuant to the fraudulent bills submitted through Atlantic Chiropractic.

306.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

307.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWELFTH CAUSE OF ACTION
**Against Khait**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

308. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

309. Active Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

310. Khait knowingly has conducted and/or participated, directly or indirectly, in the conduct of Active Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Active Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Active Chiropractic obtained its patients through the illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Active Chiropractic's employees. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

311. Active Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Khait operates Active Chiropractic, insofar as Active Chiropractic is

not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Active Chiropractic to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Active Chiropractic to the present day.

312.    Active Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Active Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

313.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $194,000.00 pursuant to the fraudulent bills submitted through Active Chiropractic.

314.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Against Khait and John Doe Defendants "1-10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

315.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

316.    Khait and John Doe Defendants "1-10" are employed by or associated with the Active Chiropractic enterprise.

317.    Khait and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Active Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Active Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Active Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Active Chiropractic's employees.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".   Each such mailing was made in furtherance of the mail fraud scheme.

318.    Khait and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

319.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $194,000.00 pursuant to the fraudulent bills submitted through Active Chiropractic.

320.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**Against Khait and Active Chiropractic
(Common Law Fraud)**

321.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

322.    Khait and Active Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

323.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Active Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Khait and Active Chiropractic; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with

the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Active Chiropractic, when in fact many of the billed-for services were provided by independent contractors.

324.   Khait and Active Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Active Chiropractic that were not compensable under the New York no-fault insurance laws.

325.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $194,000.00 pursuant to the fraudulent bills submitted through Active Chiropractic.

326.   Khait and Active Chiropractic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

327.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Against Khait and Active Chiropractic
### (Unjust Enrichment)

328.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

329.   As set forth above, Khait and Active Chiropractic have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

330.    When GEICO paid the bills and charges submitted by or on behalf of Active Chiropractic for PIP Benefits, it reasonably believed that it was legally obligated to make sure that such payments on Active and Khait's improper, unlawful and/or unjust acts.

331.    Khait and Active Chiropractic have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Khait and Active Chiropractic voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

332.    Khait and Active Chiropractic's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

333.    By reason of the above, Khait and Active Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $194,000.00.

**AS AND FOR A SIXTEENTH CAUSE OF ACTION**
**Against John Doe Defendants "1-10"**
**(Aiding and Abetting Fraud)**

334.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

335.    John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Khait and Active Chiropractic.

336.    The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Active Chiropractic in exchange for the illegal kickbacks from Khait and Active Chiropractic, and knowingly participating and assisting in subjecting the Insureds to a predetermined treatment protocol to maximize profits without regard to patient care.

337.   The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Khait or Active Chiropractic to obtain payment from GEICO and other insurers.

338.   John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Khait and Active Chiropractic for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

339.   The conduct of John Doe Defendants "1-10" cause GEICO to pay more than $194,000.00 pursuant to the fraudulent bills submitted through Active Chiropractic.

340.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

341.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### Against Khait
### (Violation of RICO, 18 U.S.C. § 1962(c))

342.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

343.   Actual Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

344.    Khait knowingly has conducted and/or participated, directly or indirectly, in the conduct of Actual Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Actual Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Actual Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Actual Chiropractic's employees.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

345.    Actual Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Khait operates Actual Chiropractic, insofar as Actual Chiropractic is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Actual Chiropractic to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does

the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Actual Chiropractic to the present day.

346.    Actual Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Actual Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

347.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $129,000.00 pursuant to the fraudulent bills submitted through Actual Chiropractic.

348.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
#### Against Khait and John Doe Defendants "1-10"
#### (Violation of RICO, 18 U.S.C. § 1962(d))

349.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

350.    Khait and John Doe Defendants "1-10" are employed by or associated with the Actual Chiropractic enterprise.

351.    Khait and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Actual Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails

submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Actual Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Actual Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Actual Chiropractic's employees.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".  Each such mailing was made in furtherance of the mail fraud scheme.

352.    Khait and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

353.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $129,000.00 pursuant to the fraudulent bills submitted through Actual Chiropractic.

354.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
### Against Khait and Actual Chiropractic
### (Common Law Fraud)

355.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

356.     Khait and Actual Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

357.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Actual Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Actual Chiropractic and Khait; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Actual Chiropractic, when in fact many of the billed-for services were provided by independent contractors.

358.     Khait and Actual Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Actual Chiropractic that were not compensable under the New York no-fault insurance laws.

359.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $129,000.00 pursuant to the fraudulent bills submitted through Actual Chiropractic.

360.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
### Against Khait and Actual Chiropractic
### (Unjust Enrichment)

361.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

362.     As set forth above, Khait and Actual Chiropractic have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

363.     When GEICO paid the bills and charges submitted by or on behalf of Actual Chiropractic for PIP Benefits, it reasonably believed that it was legally obligated to make sure that such payments based on Actual Chiropractic and Khait's improper, unlawful, and/or unjust acts.

364.     Khait and Actual Chiropractic have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Khait and Actual Chiropractic voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

365.    Khait and Actual Chiropractic's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

366.    By reason of the above, Khait and Actual Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $129,000.00.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
### Against John Doe Defendants "1-10"
### (Aiding and Abetting Fraud)

367.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

368.    John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Khait and Actual Chiropractic.

369.    The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Actual Chiropractic in exchange for illegal kickbacks from Khait and Actual Chiropractic and knowingly participating and assisting in subjecting the Insureds to a predetermined treatment protocol to maximize profits without regard to patient care.

370.    The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Khait or Actual Chiropractic to obtain payment from GEICO and other insurers.

371. John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Khait and Actual Chiropractic for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

372. The conduct of John Doe Defendants, "1-10" cause GEICO to pay more than $129,000.00 pursuant to the fraudulent bills submitted through Actual Chiropractic.

373. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

374. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
### Against Khait
### (Violation of RICO, 18 U.S.C. § 1962(c))

375. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

376. American Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

377. Khait knowingly has conducted and/or participated, directly or indirectly, in the conduct of American Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that American Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically

necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) American Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by American Chiropractic's employees. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in part, in the chart annexed hereto as Exhibit "5".

378. American Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Khait operates American Chiropractic, insofar as American Chiropractic is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for American Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by American Chiropractic to the present day.

379. American Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by American Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

380.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,000.00 pursuant to the fraudulent bills submitted through American Chiropractic.

381.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
**Against Khait and John Doe Defendants "1-10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

382.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

383.     American Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

384.     Khait and John Doe Defendants "1-10" are employed by or associated with the American Chiropractic enterprise.

385.     Khait and John Doe Defendants "1-10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of American Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that American Chiropractic was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used

for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) American Chiropractic obtained its patients through the Defendants' illegal kickback and self-referral schemes; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by American Chiropractic's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

386.    Khait and John Doe Defendants "1-10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

387.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,000.00 pursuant to the fraudulent bills submitted through American Chiropractic.

388.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION
**Against Khait and American Chiropractic**
**(Common Law Fraud)**

389.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

390.    Khait and American Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

391.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that American Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich American Chiropractic and Khait; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of American Chiropractic, when in fact many of the billed-for services were provided by American Chiropractic.

392.    Khait and American Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a concealed effort to induce GEICO to pay charges submitted through American Chiropractic that were not compensable under the New York no-fault insurance laws.

393.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $179,000.00 pursuant to the fraudulent bills submitted through American Chiropractic.

394.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

395.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
### Against Khait and American Chiropractic
### (Unjust Enrichment)

396.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

397.    As set forth above, Khait and American Chiropractic have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

398.    When GEICO paid the bills and charges submitted by or on behalf of American Chiropractic for PIP Benefits, it reasonably believed that it was legally obligated to make sure that such payments based on American Chiropractic and Khait's improper, unlawful, and/or unjust acts.

399.    Khait and American Chiropractic have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Khait and American Chiropractic voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

400.    Khait and American Chiropractic's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

401.   By reason of the above, Khait and American Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $179,000.00.

## AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION
### Against John Doe Defendants "1-10"
### (Aiding and Abetting Fraud)

402.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

403.   John Doe Defendants "1-10" knowingly aided and abetted the fraudulent scheme that was perpetrated by Khait and American Chiropractic.

404.   The acts of John Doe Defendants "1-10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to American Chiropractic in exchange for illegal kickbacks from Khait and American Chiropractic and knowingly participating and assisting in subjecting the Insureds to a predetermined treatment protocol to maximize profits without regard to patient care.

405.   The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.   The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Khait or American Chiropractic to obtain payment from GEICO and other insurers.

406.   John Doe Defendants "1-10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Khait and American Chiropractic for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

407.    The conduct of John Doe Defendants "1-10" caused GEICO to pay more than $179,000.00 pursuant to the fraudulent bills submitted through American Chiropractic.

408.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

409.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

410.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A.    On the First Cause of Action against Khait and the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against Khait, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $252,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Khait and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $252,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Khait and City Chiropractic, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $252,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Khait and City Chiropractic, more than $252,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $252,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Khait, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $392,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.     On the Eighth Cause of Action against Khait and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $392,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.     On the Ninth Cause of Action against Khait and Atlantic Chiropractic, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $392,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Khait and Atlantic Chiropractic, more than $392,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $392,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Khait, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $194,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Khait and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $194,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Khait and Active Chiropractic, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $194,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Khait and Active Chiropractic, more than $194,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$194,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q. On the Seventeenth Cause of Action against Khait, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $129,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R. On the Eighteenth Cause of Action against Khait and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $129,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S. On the Nineteenth Cause of Action against Khait and Actual Chiropractic, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $129,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T. On the Twentieth Cause of Action against Khait and Actual Chiropractic, more than $129,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

U. On the Twenty-First Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $129,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

V. On the Twenty-Second Cause of Action against Khait, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $179,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.     On the Twenty-Third Cause of Action against Khait and John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $179,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.     On the Twenty-Fourth Cause of Action against Khait and American Chiropractic, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $179,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.     On the Twenty-Fifth Cause of Action against Khait and American Chiropractic, more than $179,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

Z.     On the Twenty-Sixth Cause of Action against John Doe Defendants "1-10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $179,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: April 3, 2017
Uniondale, New York

RIVKIN RADLER LLP

By: _____
Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Ryan Goldberg (RG 7570)
Sean Gorton (SG 9310)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and GEICO
Casualty Company*

3398734

93